## ISAAC C. RENFROW V. UNITED STATES.

1. INTOXICATING LIQUORS— *Sale to Indians*.  Section 2139, Revised Statutes of United States, which provides that "every person who sells, exchanges, gives, barters or disposes of any ardent spirits, etc., * * * to any Indian, under charge of an Indian superintendent or agent," is applicable to all Indians who are, in any degree, under the control or charge of an Indian agent.

2. SAME—*Sale of Liquor to Indians—When Illegal.*  The fact that an Indian received allotted lands in Kansas in the year 1866, and took the oath of allegiance to the United States, and became an elector of the state of Kansas, and is above the age of 21 years, is not sufficient to take him out of the inhibition contained in §2139, *supra.*, provided he has not been released by the government from the charge, supervision and control of an Indian agent.

3. SAME—*Indian Under Charge of Indian Agent.*  Neither does the fact that an Indian may be living upon allotted land and not drawing any annuity from the government, authorize the sale to such Indian of intoxicating liquors, provided such Indian is still under the supervision or control of an Indian agent.

*Error from the District Court of Pottawatomie County.*

The opinion states the facts.

*Pendleton, Melton & Blakeney,* for appellant.

*Caleb R. Brooks* and *Roy V. Hoffman,* for appellee.

The opinion of the court was delivered by

DALE, C. J.: In December, 1893, in the district court of Pottawatomie county, sitting with the powers and jurisdiction of a federal court, Isaac C. Renfrow plead not guilty to an indictment therein pending against him, wherein he was charged, in substance, with the sale of spirituous liquors, in three separate counts, to three different persons, described as Indians, in the charge of an Indian agent.

The case was duly submitted to the trial court upon

an agreed statement of facts, which may be briefly stated as follows:

1. Renfrow, the defendant, is a citizen of the United States duly licensed to sell intoxicating liquors. under the laws of the Territory of Oklahoma.

2. Renfrow sold whisky to one Joe Moose, a full-blood Pottawatomie Indian, residing upon allotted land, and holding the same pursuant to treaty, ratified by act of congress, 26 Statutes at Large, 1016, and his relations to the general government, to the Indian department and to the Indian agent at Sac and Fox agency, being the same as that of all other of the Pottawatomie Indians, under the acts of congress governing such relations; and that there was, at the date alleged in the indictment, a United States Indian agency at Sac and Fox agency, in Lincoln county, in the Territory of Oklahoma, with an agent in charge, who claimed to have charge and control of the Pottawatomie Indians. It was further stipulated that said Joe Moose, and his father, received allotted lands in Kansas, in the year 1866, and took the oath of allegiance to the United States, and became electors of the state of Kansas, and of the United States, at that time, under the provisions of a certain act of congress providing for the naturalization of Indians. That afterwards, together with the other Pottawatomie Indians, he removed to the Indian Territory and went upon what was called the Pottawatomie reservation, which was afterwards allotted under a treaty, ratified by act of congress. (26 Stat. at Large, *supra*.)

3. It was further agreed that said Renfrow sold spirituous liquor to one Thomas .Goodbo, at the time and place alleged in the indictment, and that said Thomas Goodbo's relation to the general government and the Indian department were the same as those of the said Joe Moose, except that said Goodbo is a mixed blood Pottawatomie, his father being a white man,

and a native born citizen of the United States, and his mother being a Pottawatomie Indian.

4. It was further stipulated that a sale of spirituous liquors was made by Renfrow to one Joseph Burnett, at the time and place charged in the indictment, and that the statements made regarding Joe Moose and Thomas Goodbo, apply to said Joseph Burnett, excepting that said Burnett is a mixed blood Pottawatomie Indian, his father being a Pottawatomie Indian, who was naturalized at the same time as the said Joe Moose, his mother being a white woman, and a citizen of the United States.

It was further agreed that, under the acts of congress, the Pottawatomie Indians have abandoned their tribal relations, and do not at this time draw annuities, and that none of the sales stated above in the indictment took place on any Indian reservation.

The facts thus agreed to were presented to the court upon the motion of the defendant for his discharge. The court overruled the motion and adjudged the defendant guilty upon each of the three counts in the indictment. The defendant filed his motion for a new trial, which was overruled, and the court then passed sentence upon him. To reverse the judgment of the court below, the defendant appeals, and assigns as error the conclusions of the court below, finding him guilty upon the facts as agreed upon.

The questions involved in this case are of great importance. Almost every county in this territory has Indians located upon allotted lands, many of whom do not draw annuities, and numbers of whom have become naturalized citizens of the United States. In all cases, however, the government is, by its Indian agents, exercising more or less control over such Indians.

Under the agreed statement of facts it appears that the Pottawatomie tribe of Indians have dissolved

their tribal relations, and are living upon their allotted lands, and are not drawing annuities from the government of the United States, but that an Indian agent, located at Sac and Fox United States Indian agency, still claims to exercise supervision and control over them. The extent of the control so exercised is not stated, and we will have to determine what supervision and control the Indian agent does exercise, under the acts of congress and direction of the Indian department, and from such sources determine whether or not these Indians are in fact, under such control and supervision of the Indian agent, as makes it a criminal offense for a person to sell them intoxicating liquors.

Under the policy of the government, the old methods, adopted by the Indians. themselves, are giving way, and they are gradually growing out of their tribal relations, and becoming self-supporting, and taking on the ways of white people. To protect the Indians in the progress of their emancipation from former conditions, and to the extent to which they become capable of assuming a higher civilization, relaxing the surveillance which the government has placed around them, has ever been our policy in dealing with the Indians. And it is intended, and hoped, by a diligent pursuit of this policy, to, ultimately, save and civilize the Indians, in order that they may not continue to be a source of trouble to our government, or become extinct. In carrying out this policy of our government, congress has, from time to time, adopted such means as are deemed best suitable to effectuate this intention, and we, therefore, have laws governing commerce between the white citizens and the Indians, laws to protect from invasion upon reservations, set apart for the different tribes, and laws which prohibit any person from selling to an Indian, in charge of an Indian agent, intoxicating liquors.

Congress has, also, passed laws having for their purpose the enlargement of the privileges of an Indian, such as giving them their land in severalty, providing for their taking land as a homestead, and, upon their reaching a certain condition of self-reliance and intelligence, they may become naturalized citizens of the United States, with the right to vote, hold office, and exercise any of the privileges usually accorded to a citizen of this country. In a discussion of the questions under consideration, it becomes important to bear these suggestions in mind, as they are factors in arriving at a correct conclusion.

Previous to February 27, 1877, congress, by different enactments, passed laws having for their purpose the prohibition of the sale of liquor to Indians, and, on the date last mentioned, provided, in § 2139, ch. 69, p. 244, Stat. at Large, as follows:

"No ardent spirits shall be introduced, under any pretense, into the Indian country. Every person, except an Indian, in the Indian country, who sells, exchanges, gives, barters, or disposes of any spirituous liquors, or wine, to any Indian under the charge of an Indian superintendent or agent, or attempts to introduce any spirituous liquors, or wine, into the Indian country, shall be punished by imprisonment for not more than two years, and by a fine of not more than $300." * * *

July 23, 1892, § 2139, *supra*, was amended to read as follows:

" No ardent spirits, ale, beer, wine or intoxicating liquor or liquors of whatever kind shall be introduced under any pretence into the Indian country, and every person who sells, exchanges, barters or disposes of any ardent spirits, ale, beer, wine, or intoxicating liquors of any kind to any Indian under the charge of an Indian superintendent or agent, or introduces or attempts to introduce any ardent spirits, ale, wine, beer, or intoxicating liquor of any kind into the Indian country, shall be punished ·by imprisonment for

not more than two years and by fine of not more than $300 for each offense." * * (27 Stat. at Large, 260.)

This section, as amended, is the one relied upon by the prosecution to sustain the conviction in this case. And it becomes therefore highly important to accurately fix the status of the Indians named in the indictment to whom liquor was sold, and determine whether or not they are still such Indians for whose protection the statute was enacted.

It will be conceded that congress has a right to regulate commerce between the whites and Indians and punish for a violation of its laws relating thereto. (*U. S. v. Holliday*, 3 Wall. 407; *U. S. v. Forty-three Gallons of Whiskey*, 93 U. S. 188.)

The first treaty with the Pottawatomie tribe of Indians was concluded between Major-General Anthony Wayne and the Pottawatomies, and proclaimed December 22, 1795. Subsequent to that time more than a score of treaties between the gevernment and these Indians have defined the varying status of their relations. In all of them the government asserts its amity, friendship and protection to these Indians. In the treaty proclaimed August 7, 1868, by President Andrew Johnson, the preamble recites, that it is for the purpose of purchasing a home for the Pottawatomie Indians in the Indian country south of Kansas. Article 1 recites that such tract of land, not exceeding thirty miles square, shall be set apart as a reservation for the reasonable use and occupancy of the tribe. Article 4, provides:

"A register shall be made, under the direction of the agent and the business committee of the tribe within two years of the ratification of this treaty, which shall show the names of all members of the tribe who declare their desire to remove to the new reservation, and of all who desire to remain and to become citizens of the United States."

Under the provisions of this treaty, the tract of

land was purchased which was included within the boundaries of Oklahoma upon the organization of this territory. This reservation was by the treaty, ratified March 3, 1891, (26 Stat. at Large, 1016) ceded and relinquished back to the United States, and as a part consideration for such relinquishment, patents to allotments in severalty were issued to certain members of the tribe, under conditions, among which we find that "When said allotments shall be so confirmed and approved by the secretary of interior, the title in each allottee shall be evidenced and protected in every particular, in the same manner and to the extent provided for in the above mentioned act of congress," (referring to the act approved Feb. 8, 1887, known as "The Dawes Act,") which is entitled "An Act to Provide for Allotment of Lands in Severalty of Indians on the Various Reservations, and to Extend the Protection of the Laws of the United States and Territories over the Indians, and for other purposes." Under this act these Indians, Moose, Goodbo and Burnett (the Indians to whom it is agreed the defendant Renfrow sold the intoxicating liquors) received allotments in severalty, and the protection provided for in the treaty of February 8, 1887, such treaty extending over them, in common with the other members having allotments under the provisions of the same.

It becomes important to notice what steps, if any, the secretary of the interior and the commissioner of Indian affairs have taken to carry into effect the protection guaranteed by the treaty above referred to, and under what authority they assume to act in the premises. Section 2114, R. S. U. S. provides:

"The president is authorized to exercise general superintendence and care over any tribe or nation which was removed upon an exchange of territory under authority of the act of May 28, 1830, 'To provide for an exchange of lands with the Indians resid-

ing in any of the states or territories, and for their removal west of the Mississippi;' and to cause such tribe or nation to be protected at their new residence against all interference or disturbance from any other tribe or nation of Indians, or from any other person or persons whatsoever."

We find in § 2052, Revised Statutes of United States, authority for the appointment of an Indian agent for the Wichita, and neighboring tribes west of the Choctaws and Chickasaws, and in § 2059, id., we find that "the president, whenever he shall judge it expedient to discontinue any Indian agent, may transfer the same from the place or tribe designated by law to such other place or tribe as the public service may require."

Under this authority an Indian agent was appointed for the Sac and Fox Indian agency, in the Indian Territory, and the jurisdiction of said agency subsequently extended over the Iowas, Pottawatomies, Kickapoos and Absentee Shawnees. Such was the jurisdiction of this agency at the time when the Organic Act constituting this territory included the same within the boundaries of the Territory of Oklahoma. An agent has continued to reside, and now resides, at Sac and Fox agency, who draws a salary from the government for the purpose of looking after the interests and supervising the affairs of the Indians above named. While the Pottawatomie Indians have advanced rapidly in the scale of civilization, have taken their lands in severalty, and relinquished their reservation to the government, and, while the government control over their affairs does not now exist in the degree it once did, yet no act or utterance, either by treaty, congress or department can be found whereby the government vigilance is entirely relaxed and its control over their affairs abandoned.

At the date named in the indictment, the agency still continued, and the agent and other employes

appointed and paid from government funds are continued for the manifest purpose of keeping the directing arm of the government around these Indians until the shall have grown out of their pupilage unto full responsibility of citizenship. And by virtue of such control in their affairs may be cited the fact that no Pottawatomie Indian can lease his allotment, except the lease receives the approval of the department; and the government's official representative in these matters, stationed at the agency, is the authority through which the department acts in approving or disapproving the leasing of the allotments. And, under the provisions of the treaty, the allotted lands cannot be sold for a period of twenty-five years, and all contracts made in relation thereto for such period are declared absolutely null and void. (Act of congress, February 8, 1877, *supra.*)

Section 2053, Revised Statutes of United States, reads as follows:

"It shall be the duty of the president to dispense with the service of such Indian agents and superintendents as may be practicable."

And in § 2050 *supra*, the president is authorized to discontinue any Indian agency or transfer the same from place to place as the public service may require. This power so granted to the president has not been exercised to discontinue the Indian agency at Sac and Fox agency, so far as it relates to the supervision and control of the Pottawatomie Indians. And it may, therefore, be assumed, we think, that, in the mind of the president and the commissioner of Indian affairs, the time has not yet arrived when the Pottawatomie Indians may be entirely outside the protection of the laws of the United States as defined in the treaty with such tribe. And it would appear reasonable that, until some affirmative act or declaration was made by the authorities of the government having

such matters in charge to that effect, that such supervision and control exists.

It is contended by counsel for appellant that there is no satisfactory proof of the fact that these Indians are still under the authority of an Indian agent. Under the agreed statement of fact we find the following allegation: "And that there was at the date alleged in the indictment, a United States Indian agency at Sac and Fox agency, in said territory, with an agent in charge, who claimed to have charge and control of the Pottawatomie Indians." While it may be properly stated that this is somewhat indefinite, yet it occurs to us that we are not at liberty to presume that a public officer is exercising functions of office not in conformity with the rules and regulations of the department which he serves; and we therefore think that the court below was warranted in holding that the allegation referred to was sufficient to justify such court in presuming that the agent was acting within the scope of his authority.

Upon these questions as to whether or not the spirituous liquor sold to these Indians must have been sold within an Indian reservation in order to convict the defendant of the crime charged in the indictment, the case of *U. S. v. Holliday*, 3 Wall. 407, is in point. Mr. Justice Miller, delivering the opinion of the court said:

"The facts referred to concisely are that spirituous liquor was sold within the territorial limits of the state of Minnesota, and without any Indian reservation, to an Indian of the Winnebago tribe, under the charge of the United States Indian agent for said tribe. * * * The policy of the act is the protection of those Indians who are, by treaty or otherwise, under the pupilage of the government, from the debasing influence of the use of spirits; and it is not easy to perceive why that policy should not require their preservation from this, to them, destructive poison, when they are outside of a reservation as well

as within it. The evil effects are the same in both cases."

In *U. S. v. Haas*, 3 Wall. 407, the same justice discusses further the proposition and arrives at the same conclusion.

We conclude, then, that it is wholly immaterial whether an Indian is within or without a reservation, so long as he is under the charge of an Indian agent. A person is amenable to the law who sells him intoxicating liquors.

The act of congress of 1887, *supra.*, in *Eells, et al. v. Ross*, 64 Fed. Rep. 417, and in *Beck v. Flournoy Livestock and Real Estate Co.* 65 Fed. Rep. 30, has received judicial construction, and, as we gather from these cases, the allotment of land and becoming naturalized citizens of the United States, do not, necessarily, release the Indians from the control of the Indian agent. There is still much wherein the Indian agent may act in the protection of the Indians after they have taken their land in severalty and become naturalized citizens of the United States. They are still Indians, with the same intelligence and power to protect themselves, after the passage of the act, that they had previous thereto. The Indian department is still compelled to assist them in the leasing of their lands, and to exercise supervision over them in various ways wherein it is deemed necessary for their protection. And in the act of February 8, 1877, (24 Stat. at Large, 388) under the provisions of which the appellant says he has not violated the act of congress prohibiting him from the sale of liquors to these Indians, will be found a provision, which reads as follows:

"That, upon the approval of the allotments provided for in this act, by the secretary of the interior, he shall cause patents to issue therefor, in the name of the allottees, which patents shall be of the legal effect, and declare the United States does and will hold the land thus allotted for the period of twenty-

five years in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, to his heirs, according to the laws of the state or territory where such land is located, and that, at the expiration of such period, the United States will convey the same, by patent, to such Indian or his heirs aforesaid, in fee, in discharge of such trust, and free of all charge or encumbrance whatsoever, provided: That the president of the United States may, in any case, in his discretion, extend the period."

And under this provision, and in accordance with the general policy of the government, the commissioner of Indian affairs has, through the agent at the Sac and Fox Indian agency, assumed and exercised the right to supervise the leasing of these alloted lands, and to take such general supervision over the Indians formerly belonging to the Pottawatomie tribe as, in his judgment, is necessary for their protection against the encroachment of other parties.

There seems to be a contention upon the part of counsel for the defendant below that, because these Indians have become, under the laws of the United States, naturalized citizens, that therefore people are at liberty to deal with them to the same extent as they would with white citizens. We think counsel are in error in this regard. These Indians may be citizens of the United States, and yet not possessed of all the privileges given to other citizens. There is such a thing as a qualified citizenship. In *Eells v. Ross, supra,* in speaking upon the question of citizenship, under the act of 1887, the court says:

"The act of 1887, which confers citizenship, clearly does not emancipate the Indians from all control. * * Section 3 provides for the leasing of lands. under certain contingencies, under the regulations of the secretary of the interior, and the proviso of the section contemplates agents in charge of the reservation. Besides the practice of the department has been and

is to maintain them and this practice is respectable evidence of a correct interpretation of the statute by officers who may have suggested the policy and written the provisions of the statute.   *   *   *   That the abolition of reservations and of the guardianship of the Indians is the ultimate hope of the policy, there can be no doubt; but it will not be soonest realized by attributing fanciful qualities to the Indians, or by supposing that their natures can be changed by legislative enactment.   *   *   *   The patent has clear words of prohibition against alienation, and, even if it had omitted them, the treaties and law imposed them.  ( *Taylor v. Brown*, [Dak.] 40 N. W. 527.)  The power of the government to impose the restraints is not questioned, and its purpose is certainly not ambiguous."   *   *   *

This decision is a construction upon the act of 1887, the authority under which the Pottawatomies resident in Oklahoma reduced their holdings in common to allotments in severalty; and if congress had the power to continue the government's protection over the individual holdings, and to authorize its agents or superintendents to see that these provisions are enforced, it certainly cannot be deduced that the application of § 2139 *supra*, is destroyed, or that these Indians are not under the charge of an Indian agent within the meaning of the liquor traffic restrictions.

As to the question of the length of time these Indians have been citizens, and also as to whether they became citizens under the act of 1887, *supra*, or in Kansas, in 1866, is, we think, immaterial.  The statement of facts shows that they bear the same relation to the general government to the Indian department, and to the Indian agent at Sac and Fox agency, as do the other Pottawatomie Indians.  Neither do we think that it matters whether they are full-blood Indians, or less than full-blood Indians.  The relation they bear to the general government, by treaty stipulations, is that of Indians, still to some extent under

the control of the Indian department. (Vol. 20, p. 711, Opinions of Att'y Gen'l, U. S.; *Famous Smith v. U. S.* 151 U. S. 50.)

After consideration of the questions involved in this case, we conclude, therefore, that when it is shown that the Indian has not reached that condition of intelligence and self-reliance which, in contemplation of law, entitles him to all the rights, privileges, and immunities granted to other citizens, or that the president has not, under the authority granted him by congress, discontinued the control and supervision of the Indian agent over the Indian, a person who sells or disposes of liquor to such Indian is guilty of a violation of the law.

The judgment of the lower court is affirmed.

Scott, J., having presided at the trial of the cause below, not sitting; all the other Justices concurring.