FRANK LABADIE v. THE UNITED STATES OF AMERICA.
(Filed July 30, 1897.)

1. TREATY STIPULATION—*Policy of the Government in Dealing With Indians.* Under the treaty stipulations between the government and the Osage Indians, as they now exist, and by reason of the uniform policy of the government in its dealings with this and the other tribes of Indians of the United States, the Osage tribe of Indians are occupying their reservation under the express sanction and authority of the United States, and as long as the tribal relations continue to exist and until such time as the government shall by its own volition cease control and supervision over such tribe, the fact that the government may have issued a patent to the Indians for lands embraced within their reservation does not take such reservation out of the prohibition contained in the act of congress of June 4, 1888.

2. OSAGE INDIANS—*Act of June 4, 1888, Applicable to.* The Osage Indians are occupying their reservations under authority of the United States and the act of congress of June 4, 1888, which provides that every person who cuts timber standing upon any Indian reservation or lands belonging to or occupied by any tribe of Indians under authority of the United States shall be punished by a fine of not more than $500, or be imprisoned not more than twelve months, or both, is applicable to the Osage Indian reservation.

3. OSAGE RESERVATION—*Act of June 4, 1888, Applies to an Indian.* The act of congress of June 4, 1888, is applicable to an Indian who sustains tribal relations who cuts timber for speculative purposes, standing upon the Osage Indian reservation.
(Syllabus by the Court.)

*Error from the District Court of Pawnee County; before A. G. C. Bierer, District Judge.*

*Hill, Fitzpatrick & McGuire,* and *Buckner & Sons,* for plaintiff in error.

*C. R. Brooks, United States Attorney,* and *Roy V. Hoffman, Assistant United States Attorney,* for defendant in error.

Opinion of the court by

DALE, C. J.: On October 30, 1894, an information was filed in the district court of Pawnee county, Oklahoma Territory, sitting with powers of a district court of the United States, charging the appellant, Frank Labadie, with cutting timber in that part of the Osage nation attached to Pawnee county for judicial purposes. The case was tried upon an agreed statement of facts "waiving all informalities and technicalities, the desire being to have the law settled governing the matter." The court, upon a full hearing, decided in favor of the government, and assessed a fine of $500 and costs of prosecution against Labadie, and it is to reverse the judgment of the court below that the case is brought to this court. The case was tried in the court below upon an agreed statement of facts, which, omitting the caption is as follows:

### AGREED STATEMENT OF FACTS.

"It is hereby agreed by and between the plaintiff and the defendant in the above entitled cause that the following is a true and correct statement of the facts in the above entitled cause, to-wit:

1. "That the Osage tribe of Indians own and occupy a tract of land embracing about one and one-half million acres, situated in the northeast corner of the Territory of Oklahoma.

2. "That, under and by authority of the interior department of the United States government, the Osage Indians have erected and now maintain a tribal government, which is styled and known as the Osage Nation.

3. "That the legislative authority of said Osage Nation, as well as a general supervisory control of the affairs of said tribe, is vested in the national council of the Osage Nation, composed of fifteen members, elected from the body of said tribe.

4. "That under and by virtue of the laws of the Osage Nation, a member of the Osage tribe of Indians may reduce to his own possession, use and occupation, any of the lands of said tribe which are not occupied and improved by some other member of said tribe.

5. "That under and by virtue of the laws of the Osage Nation, any member of said Osage tribe of Indians may cut and remove live timber for market from any of the lands owned by the Osage tribe of Indians, and embraced within the Osage Nation: *Provided,* that he first compensate the person occupying and holding the land upon which such timber is growing for the destruction thereof, and pay into the treasury of the Osage Nation a royalty on each and every thousand feet of lumber contained in all timber so cut, removed and marketed

6. "That the above named defendant, Frank Labadie, is by blood a member of the Osage tribe of Indians, is now and was prior to the acts complained of in this indictment, residing within the Osage Nation and sustained tribal relations with the Osage tribe of Indians, enjoying all the rights and privileges of a member of said tribe and a citizen of the Osage Nation.

7. "That on or about the ——— day of ———— 1894, certain members of the Osage tribe of Indians, who were then sustaining tribal relations with said tribe and occupying and possessing certain portions of the lands embraced in the Osage Nation and owned by the Osage tribe of Indians, sold to this defendant live timber thereon standing; which timber was by this defendant cut and removed therefrom.

8. "That the above named defendant, Frank Labadie, has paid to the Osage Nation all royalties due said Nation in behalf of said tribe of Indians which were and are by the laws of the Osage Nation due and collectable upon said timber so cut by this defendant.

9. "That the cutting of timber herein mentioned and referred to, occurred within that portion of the Osage Nation which is attached to the county of Q, in the Territory of Oklahoma, for judicial purposes.

"UNITED STATES, Plaintiff,
"C. R. BROOKS, U. S. Attorney,
"By ROY HOFFMAN, Asst. U. S. Atty.
"FRANK LABADIE,
"By HILL, FITZPATRIK & MCGUIRE, his Attys."

While numerous assignments of error are made, they may all be grouped and considered as two propositions, a proper determination of which will cover all of the matters raised in this case.

The first is, does the act of congress making it a crime to unlawfully cut timber on an Indian reservation apply to a member of the Osage tribe of Indians under the facts in this case; and second, does the act of congress in question apply to an Indian while dealing with members of his own tribe and upon an Indian reservation which has been by the government patented to the tribe living upon it?

The questions presented are of much interest inasmuch as they deal with the policy of the government toward the Indians and determine the power of the government to protect the forests which stand upon the different Indian reservations in this Territory. The authority under which this prosecution is urged is contained in the act of June 4, 1888, Supplemental R. S. U. S. 588, which act is as follows:

"That section 5388 of the Revised Statutes of the United States be amended to read as follows:

"Every person who unlawfully cuts, or aids or is employed in unlawfully cutting, or wantonly destroys, or procures to be wantonly destroyed, any timber standing

upon the land of the United States, which, in pursuance of law, may be reserved or purchased for military or other purposes, or upon any Indian reservation, or lands belonging to or occupied by any tribe of Indians under the authority of the United States, shall pay a fine of not more than five hundred dollars, or be imprisoned not more than twelve months, or both, in the discretion of the court."

The section to which the foregoing is an amendment became a law by the act of March 3, 1859, (11 Stat. at Large 408,) which original section provides:

"Every person who unlawfully cuts or aids or is employed in unlawfully cutting, or wantonly destroys, or procures to be wantonly destroyed, any timber standing upon lands of the United States, which, in pursuance of law, may be reserved or purchased for military or other purposes, shall pay a fine of not more than five hundred dollars and be imprisoned not more than twelve months."

It would seem that until the passage of the amendment June 4, 1888, *supra*, there was no adequate protection to timber standing upon Indian reservations, and the amendment was manifestly for the purpose of extending the power of the criminal law for the protection and preservation of the timber in such reservations. And under the agreed statement of facts, as stipulated in this case, if the law is not to apply it must be because of the peculiar conditions existing in the treaty stipulations under which the Osage Indians are occupying this reservation which will take the lands so occupied by such Indians out of the prohibition contained in the statute. It will be noticed, upon a careful reading of the statute, that the scope of its language is very broad, and that it extends, not only to lands, the fee of which is still in the United States, but specifically recites that it shall

apply to "lands belonging to or occupied by any tribe of Indians under authority of the United States." And it is to determine the power of congress to create an offense of this character, as applied to the facts of this case that this appeal is filed, for it is alleged that the Osage tribe of Indians, being the owners of their reservation by patent from the government, their right to use the land in any manner they may think best, and their right to pass laws permitting members of their own tribe to sell and dispose of the timber growing upon the lands are questions not open for congress to pass upon, and therefore any act of congress which seeks in any manner to control their use and occupancy of the land, or the disposition of the timber standing thereon, is an invalid enactment in so far as it affects the Osage Indian reservation. It will not be necessary, in order to discuss this question intelligently, to take up, except in a brief manner, the different treaties between the Osage and other Indians and the government, in order to show the character of the title under which the Indians hold the reservation, that we may reach a correct conclusion in determining the authority of congress to pass the law under consideration, and we will refer to those only which we think bear upon the question of title and show the relations which now and always have existed between the government and Indians relative to reservations held by the different tribes of Indians.

The title of the Osage Indians to the reservation which they now occupy was through the aid of the government obtained from the Cherokee tribe of Indians, and it will be of some importance to trace the title of the Cherokees in this land, together with their status towards the gov-

ernment. Briefly stated, the government began making treaties with the Cherokees at Hopewell, on Keowee river, November 22, 1785. This was shortly after the close of the revolutionary war, when the colonies were exhausted and the Cherokees and other tribes living in the country adjacent to them were strong and able to inflict great suffering and damage upon the sparsely settled communities of the southern states. And yet even in this treaty, by art. 3, it is provided that the said Indians for themselves and their respective tribes and bands do acknowledge all the Cherokees to be under the direction of the United States and of no other sovereignty whatsoever. And in art. 9, of the same treaty, it is further provided that for the benefit and comfort of the Indians and for the prevention of injuries or privations upon the part of citizens or Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade of the Indians, and managing all their affairs in such manner as they think proper.

Thus at the beginning of the relations between the government and Cherokees they acknowledged the sovereignty and protection of the United States, and gave to congress the sole and exclusive right of regulating trade and managing their affairs.

Afterwards, and on February 7, 1792, by the Ralston river treaty, the boundary lines of the Cherokee Nation were more definitely fixed, and a guarantee was given by the United States to all lands within the boundaries thus defined, the Cherokees again acknowledged the exclusive supremacy and authority of the United States. Subsequent treaties relating to the boundary disputes, and the cession of the land guaranteed under the treaty of Feb-

ruary 7, 1792, were made on October 2, 1789; June 10, 1806; May 23, 1807; April 8, 1816; December 26, 1817. And on May 28, 1828, a treaty was finally made which transferred the Cherokees to the land they now occupy, which land was by treaties afterwards made on May 23, 1830, April 12, 1834, and December 29, 1835, by patent conveyed to the Cherokee tribe of Indians, the lands so conveyed to be by them held in common for the use and benefit of themselves and their posterity; the Osage reservation, being at the date of the last mentioned treaty a part of the lands ceded to the Cherokee Indians, and so remained until by treaty between the United States and the Cherokee Indians of July 19, 1866, it was provided that the United States might settle friendly Indians in any part of the Cherokee country west of the 26th degree of longitude. In pursuance to this agreement by act of congress, (16 Stat-at-Large, 362,) a provision was made for the purchase of lands from the Cherokees for the Osage Indians, and their removal thereto, and by subsequent acts of congress, (19 Stat-at-Large, 76, 22 Stat-at-Large, 624,) the purchase was consummated and the Osages located upon their present reservation, the Cherokees executing a conveyance in trust to the United States for the Osages.

In art. 16 of the treaty of July 19, 1866, wherein the Cherokees agreed that the United States might purchase a portion of their land for the purpose of settling friendly Indians thereon, it was also provided that the boundaries of each said district should be distinctly marked, and the land conveyed in fee simple to each member of said tribe, to be held in common or by their members or in severalty as the United States may decide. The record

fails to disclose whether or not the Cherokees have made a conveyance direct to the Osages, yet as we understand from an examination of the agreed statement of facts the United States has conveyed by patent this reservation to the Osage tribe of Indians, to be by them held in common.

Let us now briefly state the history of the relations which have existed between the Osage tribe of Indians and the United. States, in order that we may properly construe the treaty obligations which exist at the present time on the part of the government towards such tribe in the light of the claim made that they are in the use and occupancy of their reservation, independent of the laws of congress.

On April 28, 1810, (Revision of Indian Treaties, 571,) we find that the Great and Little Osage Indians occupied a portion of the Territory of Louisiana, and at that time a treaty between the United States and such tribes was concluded at Fort Clark, in which it was recited: "That the United States, being anxious to promote peace, friendship and intercourse with the Osage tribes, to afford them every assistance in their power, and to protect them from the insults and the injuries of other tribes of Indians, etc., have thought proper to build a fort    *    *    for the protection of all orderly, friendly and well disposed Indians of the Great and Little Osage Nations."    *    *

In art. 10 of such treaty it is provided that:

"The United States receive the Great and Little Osage Nations into their friendship and under their protection; and the said Nations on their part declare that they will consider themselves under the protection of no other

power whatsoever; disclaiming all right to cede, sell, or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorized by the president of the United States to make the said purchase or accept the said cession on behalf of the government."

This latter provision is in effect incorporated within the provisions of each subsequent treaty made with the Great and Little Osage Nations of Indians. At that time they occupied a considerable portion of what is known as the Louisiana purchase. Each subsequent treaty diminished their land holdings, the United States reimbursing with money and annuities for the loss to them of the portion of such holdings. In varying terms throughout all subsequent treaties, but with equal positiveness, the United States asserted its sovereignty, and with like submission upon the part of the Indians they asked protection and especially agreed never to cede or relinquish any of their lands unless authorized by the United States

The last treaty with this tribe entered into January 21, 1867, (Rev. I. T. 589,) provides:

"It is also agreed by said contracting parties that if said Indians should agree to remove from the state of Kansas, and settle on lands to be provided for them by the United States in the Indian Territory, on such terms as may be agreed on between the United States and the Indian tribes now residing in said Territory, or any of them, then the diminished reservation shall be disposed of by the United States in the same manner and for the same purpose as hereinbefore provided in relation to said trust lands, except that fifty per cent. of the proceeds of the sale of said diminished reserve may be used by the United States in the purchase of lands for a suitable home for said Indians in said Indian Territory."

A careful consideration of all the treaties will clearly demonstrate that the Osages are occupying their reservation under the express sanction of the United States. That under the treaty stipulations the United States has exercised the right of location, and the Indians themselves, by their own acts, ratified the measures taken on their behalf, and that they are willing parties to all arrangements so made.

We take judicial knowledge of the fact that the Osage Nation maintains a tribal form of government; that the government has an agent in charge of said tribe; maintain schools; licenses traders among them; protects them from invasion upon the part of the whites; supervises and controls the leasing of their lands for grazing purposes—in short in all respects takes control of their affairs to the extent of treating them as wards entitled to protection from outside influences, and directing to the fullest extent their internal affairs wherever it may be, in the opinion of the Indian commissioner, necessary for the good of the Indians themselves. This power of the government cannot be successfully impeached. It exists by reason of the sovereignty, as well as by treaty stipulations. By no act or word has the government ever surrendered any of its sovereignty over to the Indians within the United States, and the treaty stipulations of the Osage Indian tribes have always recognized the right and control to be within the United States.

In considering this question it must not be forgotten that the Indians, while holding their tribal relations, are not citizens of the United States; have never been declared such, and that they do not occupy toward the government of the United States the same position, rela-

tively speaking, as do persons who are either by birth or by the law of this government declared to be citizens of the United States.

The policy of the government in its treatment of the Indian tribes has at all times been uniform and of a character to leave but little room for doubt as to its intention. The early discoverers of this continent found here as inhabitants a race of people who subsisted chiefly by hunting the wild game which was everywhere abundant. Hardly a semblance of what we term civilization, society or government existed. They had no literature, and the arts and sciences were to them unknown. They were divided into numerous tribes and each tribe was in almost all cases in perpetual war with the others. As the different portions of the continent were dicovered they were annexed to the dominion ·of the government whose flag the explorer happened to be sailing under. In each instance the right of discovery was held to be sufficient reason and excuse for absolute appropriation of the soil. It was regarded by the Christian nations, who thus sought to appropriate this continent, as a fair exchange to the aborigines, since they gave to such Indians whom they did not kill, the arts of civilization and the beneficent influences of Christianity. It matters not that the method thus adopted may seem to us unfair, and when we contemplate the fact of the purchase of an extent of land of a state like Pennslyvania for a few dollars and a few trinkets, we may even be excused for thinking that one of the considerations which induced the trade, to-wit, Christianity, was withheld, yet these are the sources from which flow the title of our government to its soil.

For a time after the colonies had seceded from the mother country, it was our custom to make treaties with some of the Indian tribes as if they were independent of our government and enjoying the same relations, rights and liberties as foreign nations. This policy was probably as much influenced through fear as from a regard for their rights.   It is an historical fact that during the war for independence emissaries were frequently sent among the different tribes of Indians contiguous to the colonies for the purpose of inducing them to make war upon the colonies, and the conduct of the Indians at that time probably influenced this government, as a matter of policy, to make concessions which otherwise would not have been made.   Thus in the first treaty entered into, in September, 1778, with the Delawares, we find this remarkable language:

"Whereas, the enemies of the United States have endeavored, by every artifice in their power, to possess the Indians in general with an opinion that it is the design of the states aforesaid to extirpate the Indians and take possession of their country, to obviate such false suggestion the United States do engage to guaranty to the aforesaid Nation of Delewares and their heirs, all their territorial rights, in the fullest and most ample manner, as it hath been bounded by former treaties, as long as the said Deleware Nation shall abide by and hold fast the chain of friendship now entered into."

A few of the scattered remnants of that once powerful tribe are now, by the permission and under the control of the government, located in this Territory, and the power which they once possessed to such an extent as to compel this government to treat with them as an independent nation has passed from them forever, not even a semblance remaining.

It is almost needless to state that as the danger of foreign wars became more remote our policy towards the Indians gradually became bolder and, as announced in *Cherokee Nation v. State of Georgia*, 5 Peters 1, the Indians are in the condition of domestic subjects. This case was a pivotal one to the Indians and defined their status towards the government of the United States. They sought to sue as an independent nation and to enjoin the state of Georgia from enforcing its laws within the territory set aside by congress for the occupation of the Cherokees. As was customary at that time in the supreme court of the United States each of the judges gave his opinion, and it is needless to state the entire subject under discussion was exhausted. A majority of the court reached a conclusion adverse to the claim of of the Cherokees, and from Chief Justice Marshall we quote:

"Though the Indians are acknowledged to have an unquestionable and heretofore unquestioned right to the lands they ocupy until that right shall be extinguished by voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.

"They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants, and address the president as their great father. They and their country are considered by foreign nations as well as ourselves as being so completely under the sovereignty and dominion of the United States, that any

attempt to acquire their lands or to form a political connection with them would be considered by all as an invasion of our territory and an act of hostility."

This decision forever put at rest the status of the Indian tribes towards the United States.

In a case where the title to lands under a grant from the Illinois and Piankeshow tribes of Indians was sought to be asserted in favor of the grantee, the supreme court of the United States, in *Johnson and Graham, Lessees, v. William McIntosh*, (8 Wheaton 541,) Chief Justice Marshall, in an opinion, says:

"However extravagant the pretentions of converting the discovery of an inhabited country into conquest may appear, if the principle has been answered in the first instance, and afterwards sustained, if a country has been acquired and held under it; if the property of great masses of the community originates in it, it becomes the law of the land and cannot be questioned. So, too, with respect to the concomitant principle that the Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others. However this restriction may be opposed to natural right, and to the usages of civilized nations, yet if it be indispensible to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may, perhaps, be supported by reason, and certainly cannot be rejected by courts of justice."

The same principle was also asserted in *Fletcher v. Peck*, (6 Cranch 89.)

From the foregoing decision it appears, therefore, to be well settled that no lands conveyed by the United States to any tribe of Indians can be by such tribe conveyed without the consent and authority of the United

States. And this principle rests upon the ground of sovereignty in the United States, not alone over the Indians, but likewise grows out of the policy of guardianship which has always existed in favor of the United States, and has been recognized by the Indians themselves as belonging to the United States. This principle is well settled in *United States v. Kagama*, 113 U. S. 375 :

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government because it has never existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

And the right and duty of the government to so guard and protect the Indians is not less or greater because the lands upon which the Indian tribes dwell may have been conveyed to such tribe by patent. It does not rest upon the title to the land but upon the condition and weakness of the Indians This right, as heretofore shown, grows out of the sovereignty of the United States, as well as treaty stipulations with the Indian tribes, and is being constantly exercised, and it must exist until such time as the Indians have so far advanced in civilization as to enable them to direct themselves.

Counsel for appellant cite, in support of their contention, that the title in or ownership of the lands takes the case out of the statute, some decisions which we shall notice for the purpose of showing the distinction which exists between the facts upon which the decisions are based and the case we are here considering,

The case of *United States v. Joseph*, 94 U. S. 615, cited by appellant to support their contention, was an action brought by the United States to recover a penalty under section 2118, R. S. U. S., which declares:

"That every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey said land, or to designate the boundaries by marking trees or otherwise, is liable to a penalty of $1,000."

This case was brought in the courts of the territory of New Mexico. The land involved belonged to the Pueblo Indians and was conveyed to them by grant from Spain at a time when New Mexico was under the dominion of that government. When New Mexico was ceded to the United States by the treaty of Guadaloupe Hidalgo, under which New Mexico and the allegiance of its inhabitants was transferred to the United States, all grants from Spain made to its subjects before the Mexican revolution were expressly saved to the grantees, the United States relinquishing all title and claim to any of said lands; and it was for this reason that the supreme court held in *United States v. Joseph, supra*, that the law could not reach depredations upon these lands, the title to the land never having been in the United States, and the government never having claimed any control in the land it could not assert a right against a tresspasser in favor of the Indian who thus holds title. The case of *United States v. Santistevan*, (94 U. S. 619,) is based upon this same ground. This principle was also maintained in *Mitchell et al. v. United States*, 9 Peter 745; and in *United States v. Fernando*, 10 Peters 303, because of the source of title being superior to that of the United States.

We make a clear distinction between these cases and the one we are now deciding. It is true that when the Indians have secured their title to lands from a foreign government and this country afterwards acquired jurisdiction over such lands and the allegiance of the Indians under an express agreement to ratify the grant of land already made, the United States thereby is estopped from any claim of interest in said lands.

In the brief of counsel for appellant is noted a case as being in the 43rd Federal Reporter, 22, and at another place in 23rd Federal Reporter, 22. We have examined both volumes cited and cannot find the case and therefore must reach a conclusion without the aid we might receive from that decision.

But as indicative of the right of the government to make laws controlling the Indians in the use of their lands which have by deed been conveyed to them from the United States, we are not entirely without authority which may throw light upon the question. In *Cherokee Nation v. Southern Kansas Ry. Co.*, (135 U. S. 644,) arose a case wherein the Cherokee Indians sought to enjoin the Southern Kansas Railway company from building and maintaining a railroad and telegraph line through their lands, claiming that by the terms of various treaties, as well as by the character of their title in the lands, the right of eminent domain vested exclusively in the Cherokee Nation. This contention was denied and in the decision the court took occasion to state:

"By the treaty of New Echota, 1835, the United States covenanted and agreed that the lands ceded to the Cherokee Nation should at no future time, without their consent, be included in the territorial limits or jurisdiction

of any state or territory, and that the government would secure to that Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government of the persons and property within their own country belonging to their people, or such persons as have connected themselves with them; and by the treaties of Washington, 1846, and 1866, the United States guaranteed to the Cherokees the title and possession of their lands, and jurisdiction over their country. (Revision of Indian Treaties pp. 65, 79 85.) But neither these nor any previous treaties evinced any intention, upon the part of the government, to discharge them from their condition of pupilage or dependency, and constitute them a separate, independent and sovereign people, with no superior within its limits."

The same doctrine in effect is announced in *M. K. & T. R. R. Co. v. Roberts*, 152 U. S. 114. While these cases proceed upon the theory that the right of eminent domain is always in congress, by reason of the sovereignty of the United States, still they also support the doctrine that the government has never entirely surrendered the control and dominion of the tribe of Indians and their lands, notwithstanding they have conveyed the same by patent.

In vol. 19, page 232, Opinions of Attorneys General, in answer to a question submitted by the secretary of the interior, Mr. Attorney General Garland states that the law we are here considering is applicable to Indians who have received their lands in severalty, and that the trust imposed in the government to protect standing timber from spoliation, even by the Indian to whom the land is allotted, exists until the second patent is granted, or until such time as congress may deem the Indian to be in such a civilized condition as to enable him to cope with the

white man; that he is still in a condition of pupilage and wardship, and it is the duty of the government while such condition exists to prevent him from destroying and selling the timber standing upon his allotment.

And it has been held by this court, in *Renfrow v. United States*, 3 Okla. 168, that the right of the government to control the Indian, through the supervision of an agent, exists even after the Indian has taken his land in severalty.

We are not cited by counsel in their briefs, nor are we able to find a case directly in point, wherein it was sought to prevent an Indian belonging to a tribe holding a reservation by deed from the government from cutting and selling standing timber owned in common by the tribes, but we think that this question must be construed independently of the deed and in the light of the policy of the government in dealing with the Indians while sustaining tribal relations. We do know what the purpose of the government is and always has been in sustaining the relationship it does towards the Indians. It has always regarded them as being in a state of subjection to the general government, never as citizens as long as they sustain tribal relations. It has constantly endeavored to induce them to forego their nomadic existence, turn their attention to peaceful pursuits, adopt the ways of the white citizens, and become self-reliant and able to cope with the civiliztion which has since the settlement of this country constantly overcome, and by its resistless march tended to their destruction. To a limited extent this policy has succeeded, and it may truthfully be said that those Indians we now have owe their existence to the operation of this policy. This plan may not have

been the best one for the Indian which could have been adopted, but it was the terms given by the conquerors and such as the conquered were in no position to reject—with the Indian it was those terms or nothing; a rejection meant speedy annihilation; acceptance meant a longer existence with the hope of ultimate gain in immunity from danger and repose in property rights. Many remnants of once powerful and independent tribes which are now located in Oklahoma attest the destructive tendency of this policy, as well as the immunity from danger of speedy extinction, and the policy with which the government guards their financial interests.

The Osage tribe of Indians, once so numerous and brave that this government thought it to its interest to treat with them for peace, are now reduced in numbers to such an extent that they would not be able to successfully cope with the strength of the people of any one of the many counties which border upon their reservation; and yet this reservation, with all its natural wealth of agriculture, grazing and timber, is continuously held by the strong arm of the government from the greedy fingers of the ever encroaching whites, for the use and benefit of the Osages and their posterity, so long as they shall exist.    In addition to this protection the government, in the hope that some of this once powerful people may be saved to posterity, has established schools for the young, workshops for the middle aged, and placed in charge of such schools and shops men and women of high character, learning and skill, to educate alike the mind and hand, in order that the conscienceless civilization which surrounds them shall not entirely obliterate them.    Further than this, the government has taken charge of large

sums of money belonging to this tribe, received from the sale of their lands, and has so wisely invested it for them that the interest alone upon the principal so invested is sufficient to provide for each man, woman and child of the tribe the sum of $220 per annum, enough to furnish an ample living, should they choose to live in absolute idleness.

And the government licenses traders under regulations which are advantageous to the Indians; keeps vicious and greedy whites from entering upon their reservation; requires the United States attorney to represent them, free of costs, in all litigation which may be instituted against them; provides an agent who shall see to it that in their trade and other relations which they may have or sustain with the whites, they shall not be defrauded. In these and many other ways is the government caring for these Indians. In view of these facts and in the light of this policy can it be presumed that congress intended to permit the Indians to so injure themselves as they undoubtedly would if permitted to cut and dispose of the valuable timber now standing on this reservation? We think not. Much of the care and protection with which these Indians are surrounded would be thrown away and dissipated if they were permitted to dispoil this reservation, and the heritage which is intended, as well for their posterity as the present inhabitants, would lose much of its value. And this result would be the same if it were done by the Indians themselves as if it were done by the white men who, standing upon the border, look with longing eyes upon the forests of this reservation.

It is contended that because this particular Indian

purchased from the tribe, under their local regulations, that such fact relieved him from the penalty of the law. This contention is wrong, for if it is an offense against the law to cut the timber for purposes of sale or speculation, any local regulation which the tribe might make does not make it any the less an offense. It is also claimed that the statute we are here considering does not apply because the appellant is an Indian. No reason is assigned or authority cited in support of this contention, and we think the law is general in its application and is applicable alike to all who violate its provisions, and if authority were needed upon this subject it is ample and may be found in *United States v. Konkapot et al.*, 43 Fed. Rep. 64; *United States v. Cook*, 19 Wall. 592; Op. Atty. Gen. vol. 19, 194.

From the foregoing we deduce the following principles as governing in this case:

I. Under the treaty stipulations between the government and the Osage Indians, as they now exist, and by reason of the uniform policy of the government in its dealings with this and other tribes of Indians of the United States, the Osage tribe of Indians are occupying their reservation under the express sanction and authority of the United States, and as long as the tribal relations continue to exist and until such time as the government shall by its own volition cease control and supervision over such tribe, the fact that the government may have issued a patent to the Indians for lands embraced within their reservation does not take such reservation out of the prohibition contained in the act of congress of June 4, 1888.

II. The Osage Indians are occupying their reservation under authority of the United States and the act of congress of June 4, 1888, which provides that every person who cuts timber standing upon any Indian reservation or lands belonging to or ocupied by any tribe of Indians under the authority of the United States shall be punished by a fine of not more than $500, or be imprisoned not more than twelve months, or both, is applicable to the Osage Indian reservation.

III. The act of congress of June 4, 1888, is applicable to an Indian who sustains tribal relations who cuts timber for speculative purposes, standing upon the Osage Indian reservation.

The judgment of the lower court is affirmed and this case remanded with instructions that the judgment be executed.

Bierer, J., having presided in the court below, not sitting; Tarsney, J., and McAtee, J., concurring fully; Keaton, J., concurring in the conclusions reached, but not in all the reasoning in support thereof.