PEOPLE *v.* GEBHARD.

1. INDIANS—INTOXICATING LIQUORS—SALES—PERSONS OF INDIAN DESCENT.

   Section 5391, 2 Comp. Laws, prohibiting sales of liquor to any Indian or "person of Indian descent," prohibits a sale to the offspring of a white father, citizen of the United States, and an Indian mother, though the buyer sustains no tribal relations and is a citizen of the United States and of the State of Michigan.

2. SAME — CONSTITUTIONAL LAW — POLICE POWERS — INDIAN CITIZEN.

   It is competent for the State, in the exercise of its police powers, to prohibit sales of intoxicating liquors to Indians and persons of Indian descent, though they are citizens of the United States and of this State.

Exceptions before judgment from Cass; Carr, J. Submitted November 14, 1907. (Docket No. 48.) Decided February 15, 1908.

Frank Gebhard was convicted of selling liquor to a person of Indian descent. Affirmed.

*James H. Kinnane,* for appellant.

*Thomas J. Bresnahan,* Prosecuting Attorney, for the people.

BLAIR, J. The respondent having been convicted of the offense of selling liquor to Joseph Blackmond, a person alleged in the indictment to be "a person of Indian descent," brings the record to this court for review upon exceptions before sentence. By agreement of counsel, the facts were stipulated upon the record as follows:

"*First.* That on the day of the offense charged against

the defendant, Frank Gebhard, in the indictment, which is the selling to Joseph Blackmond of a glass of beer in the saloon of Gustave Weiland on the 10th day of July last; that said Blackmond was and is the son of a father who was a full blooded white man and a citizen of the United States and of the State of Michigan.

"*Second.* That the mother of said Joseph Blackmond, the alleged person of Indian descent, was a full blooded Indian Pottawatamie squaw.

"*Third.* That the said Blackmond, the person of alleged Indian descent, was, at the time of the offense charged, to wit, on the 10th day of July last, and for a number of years prior thereto had been legally married to a wife with whom he was and is living and is the father of children of that marriage.

"*Fourth.* That at the time of the offense charged against the defendant, Gebhard, to wit, on the 10th day of July last, and for a number of years prior thereto, he, the said Joseph Blackmond, had been and has continued to be and is now living according to the habits of civilized life on a farm owned by him in Cass county, Michigan, with his wife and family.

"*Fifth.* That at the time of the offense charged and for a long time prior thereto, he, the said Joseph Blackmond, had been and was segregated and separated from tribal relations except as stated in the succeeding concession hereof.

"*Sixth.* That at and prior to the time of the alleged offense, to wit, on the 10th day of July last, there was and still is an organization existing of what is known as the Pokagon Band of Pottawatamie Indians of Cass, Van Buren and Berrien counties, consisting of a chief and business committee, all of whom are now elective and elected every year; which organization exists and was gotten up, as at present constituted, for the purpose of prosecuting Indian claims against the government and against individuals for lands to which said Indians claim right and title; that the aforesaid chief is not now nor has he for several years last past and prior to said 10th day of July last been an hereditary chief, but elective, and that said organization is formal merely, but that said Pokagon Band of Pottawatamie Indians has, in one form and another, existed and continued during all of the history of Michigan with a chief, either elected or hereditary. That

said Joseph Blackmond is a member of said organization as at present constituted.

"*Seventh.* That the said Joseph Blackmond is a citizen of the United States and of the State of Michigan, who has exercised for long years past the full right of suffrage and franchise and is about 40 years old.

"*Eighth.* That if the said Joseph Blackmond were present in court he would testify that he was in said saloon of Gustave Weiland on the date charged in the indictment and received from said defendant, Frank Gebhard, a glass of beer.

"And it is conceded, as appears from the record and testimony of the county treasurer, that he is a freeholder and a taxpayer of the township of Silver Creek in the county of Cass and was such at and prior to the time of the offense charged, to wit, on the 10th day of July last."

A conviction was had under section 5391, 2 Comp. Laws, which provides that it shall not be lawful for any person except a druggist to sell intoxicating liquors "to any minor, to any intoxicated person, nor to any person in the habit of getting intoxicated, *nor to any Indian, nor any person of Indian descent,*" etc. It is contended by the respondent, and he requested the court to so instruct the jury, that under the agreed statement of facts, "the said Joseph Blackmond was not a person of Indian descent at all but a person of white or Caucasian origin and status;" *second,* "that, being a citizen of the United States and of the State of Michigan, it was not within the police power of the State of Michigan to hold liable and punish the defendant for selling liquor to him."

The first point is the one principally relied upon in the printed brief and was also the point principally presented upon oral argument. In support of his position, counsel for respondent cites *Ex parte Reynolds,* 5 Dill. (U. S.) 394, where it was held that the offspring of a union between a citizen of the United States and one who was not a citizen (in the case before the court, an Indian), takes the status of the father. In support of this proposition, counsel also cites *U. S. v. Ward,* 42 Fed. 321, 322; Vattel on Law of Nations, p. 102; *U. S. v. Hurshman,* 53

Fed. 544; 16 Am. & Eng. Enc. Law (2d Ed.), p. 217; *Keith* v. *U. S.*, 8 Okl. 446; 24 U. S. Statutes at Large, p. 390; *Renfrow* v. *U. S.*, 3 Okl. 161.

Counsel for the people argue that, although the common-law rule is well settled that in case of a mixed marriage, as between a white man and an Indian woman, the status of the offspring of that marriage is that of the father, nevertheless, by the decision of this court in *Campau* v̇. *Dewey*, 9 Mich. 381, it has been established that the words "a person of Indian descent," as used in the statute under consideration, apply to any person of mixed white and Indian blood.

From an early day, statutes have existed in this State prohibiting the sale of liquor to Indians. The governor and judges of the Territory adopted an act on the 13th of August, 1812, providing penalties and forfeitures for the sale "of any spirituous liquors to any Indian within this Territory," etc. (1 Terr. Laws, p. 180.) On February 1, 1815, "an act for the better regulation of taverns and the selling of spirituous and fermented liquors " was adopted, prohibiting the sale of liquor "to any Indian without the written permission of the superintendent of Indian affairs or a person duly authorized by him." (1 Terr. Laws, p. 201.) On the 29th day of June, 1821, "an act to prevent the selling of spirituous liquors to Indians " was adopted, providing certain penalties and forfeitures against any person who should sell intoxicating liquor "to any Indian or Indians within this Territory " (1 Terr. Laws, p. 923) without proper authority. On February 4, 1825, the legislative council of the Territory of Michigan adopted "an act to prevent the selling of spirituous liquors to Indians," whereby certain penalties and forfeitures were denounced against any person selling "any spirituous liquor or other liquor of intoxicating quality to any Indian or Indians, male or female, within this Territory." (2 Terr. Laws, p. 232.)

By section 12 of chapter 41 of the Revised Statutes of 1846 it is provided:

"Every tavern keeper, common victualer or other person who shall give, sell or dispose of any spirituous liquor, wine, mixed liquor or other intoxicating drink to any male or female Indian, or to any common drunkard, shall forfeit for each offense the sum of twenty dollars."

See Laws of 1841, page 137. By section 13 of Act No. 313 of the Public Acts of 1887, this provision assumed its present form; that it should not be lawful to sell intoxicating liquor "to any minor, to any intoxicated person nor to any person in the habit of getting intoxicated nor to any Indian, nor to any person of Indian descent," etc.

We think some importance is to be attributed, in endeavoring to ascertain the legislative intent, to the adding to the description of the offense the words "nor any person of Indian descent," since all prior statutes relating to sales to Indians applied by their terms only to such persons as would come within the definition of an Indian, male or female. It seems apparent from the grammatical construction of the section that the words "nor to any person of Indian descent" were not intended to be synonymous or coextensive with the words "nor to any Indian," but were intended to embrace those who, though of Indian blood, could not be classified as Indians.

In the case of *Campau* v. *Dewey*, 9 Mich. 381, the court considered the meaning of the terms "Indians by descent" as used in a certain treaty, it being contended that those terms as used in the treaty should be interpreted to include only persons of mixed white and Indian blood and to exclude full blooded Indians. After the consideration of numerous treaties, including the treaty of St. Joseph, of the 20th of September, 1828, the court said:

"In view of these treaties, we are entirely satisfied that the terms 'Indians by descent' have often been used, not only as descriptive of mixed Indian blood, but also (where the persons named were both kinds) as collectively applicable both to those of the full blood and those of mixed white and Indian blood; and the terms are in themselves

applicable to both, though more strictly to those of the whole blood."

The treaty made and concluded at Chicago, August 29, 1821, between Lewis Cass and Solomon Sibley, commissioners of the United States, and the Ottawa, Chippewa, and Pottawatamie nations of Indians contained, among other things, the following grants:

"ARTICLE 3. There shall be granted by the United States to each of the following persons, *being all Indians by descent*, and to their heirs, the following tracts of land: To John Burnet, 2 sections of land; to James Burnet, Abraham Burnet, Rebecca Burnet and Nancy Burnet, each 1 section of land; which said John, James, Abraham, Rebecca and Nancy are children of Kaw-kee-me, sister of Top-ni-be, principal chief of the Pottawatamie nation.   *   *   *

" To Madeline Bertrand, wife of Joseph Bertrand, a Pottawatamie woman, 1 section of land at the Parc aux Vaches on the north side of the river St. Joseph.

" To Joseph Bertrand, Jr., Benjamin Bertrand, Laurent Bertrand, Theresa Bertrand and Amable Bertrand, children of the said Madeline Bertrand, each one-half of a section of land at the portage of the Kankakee river," etc.   7 U. S. Statutes at Large, p. 219.

In the treaty of October 16, 1826, between Lewis Cass, James B. Ray, and John Tipton, commissioners on the part of the United States, and the chiefs and warriors of the Pottawatamie tribe of Indians, the following occurred: "To each of the following persons, *Indians by birth*," etc., among whom are mentioned John Jones, Betsy Ash, Charles Dick, Susanna Isaacs, Harriet Isaacs, Betsy Plummer, Angelina Isaacs, Jemima Isaacs, Jacob Corbly, William Turner, Joseph Wolf, Richard Clements, Louis M'Meff, and others.

" To Jane Martin and Betsy Martin, of Indian descent, each 1 section of land, to be located under the direction of the president of the United States.   *   *   *

" To Francois Dequindre, of Indian descent, 1 section of land.   *   *   *

" To John B. Bourie, of Indian descent, 1 section of land.   *   *   *

"To Louison, a half Pottawatamie, 2 sections of land.
* * *

"To Baptiste Jutreace, of Indian descent, one-half section of land."  7 U. S. Statutes at Large, pp. 298, 299.

See, also, Treaty of September 20, 1828, 7 U. S. Statutes at Large, p. 317; Treaty of July 29, 1829, 7 U. S. Statutes at Large, p. 320.

By the treaty of October 20, 1832, reservations were made—

"For Joseph Laughton, son of Wais-ke-shaw, one section.  * * *

"For Maw-te-no, daughter of Francois Burbonnois, jun., one section.  * * *

"For the children of Wais-ke-shaw, two sections. * * *

"For the five daughters of Mo-nee, by her last husband, Joseph Bailey, two sections.  * * *

"For Josette Beaubien and her children, two sections.
* * *

"For Washington Burbonnois, one section, joining his mother's reservation (Calish Burbonnois).  * * *

"For Nancy, Sally, and Betsy Countreman, children of En-do-ga, one section, joining the reserves near Rock village.  * * *

"The persons to whom the foregoing reservations are made are all Indians and of Indian descent."  7 U. S. Statutes at Large, pp. 378, 379.

In view of the practical definition of the phrase "Indians by descent" in these treaties and numerous others which might be cited, and the decision of this court in *Campau* v. *Dewey*, supra, we are satisfied that the legislature used the terms as there employed and defined.

Unless the words "Indians by descent" in this statute are applicable to the offspring of a marriage between a white man and an Indian woman, their application would be so restricted as to be substantially ineffective, since it is well known that marriages between white men and Indian women have not been uncommon, while marriages between white women and Indian men have been very uncommon.  Furthermore, the same reason which ap-

plies to prohibiting sales to full blooded Indians applies also to half breeds. The Indian blood, like the blood of all savage races, is liable to much greater inflammation and excitation than that of civilized races, rendering people, otherwise friendly when sober, ferocious and ungovernable when under the influence of intoxicating drink. We think that the language used by the legislature clearly manifests their intention to prohibit not only sales to full blooded Indians but to all persons with Indian blood in their veins, and that the court did not err in so instructing the jury.

We are also of the opinion that the second point is not well taken. *People* v. *Bray,* 105 Cal. 344 (27 L. R. A. 158); *Frazee* v. *County of Spokane,* 29 Wash. 278; *State* v. *Fitzpatrick,* 16 R. I. 54; Cooley on Constitutional Limitations (7th Ed.), pp. 582, 583.

Judgment is affirmed.

GRANT, C. J., and MOORE, CARPENTER, and McALVAY, JJ., concurred.