**WISCONSIN POTOWATOMIES OF the HANNAHVILLE INDIAN COMMU-NITY, Plaintiff,**

v.

**Bernard HOUSTON, Individually and as Director of the Michigan Department of Social Services, Defendant.**

**No. M-56-72 CA.**

United States District Court,
W. D. Michigan, N. D.

Nov. 16, 1973.

William S. Easton, Marquette, Mich., for plaintiff.

Donald K. Goulais, Asst. Atty. Gen., Escanaba, Mich., for defendant.

## OPINION

ENGEL, District Judge.

The Wisconsin Potowatomies of the Hannahville Indian Community are a duly constituted Indian tribe within the meaning of the Indian Reorganization Act of 1934, 25 U.S.C. § 461, their charter having been issued on July 23, 1936 by the Secretary of the Interior. Plain-tiffs reside on the Hannahville Reservation located near Wilson in Menominee County, Michigan and within this judicial district. They bring this action against Bernard Houston, individually and as Director of the Michigan Department of Social Services to regain custody and the right to determine the custody, care and control of Leroy Roger Wandahsega, Jr., born July 8, 1967; Veronica Wandahsega, born September 3, 1968, and Tyrone Wandahsega, born October 23, 1969. The suit was commenced on behalf of the tribe following the passage on June 26, 1972 of a resolution of the tribal council of the Hannahville Indian Community authorizing the employment of counsel for such purposes.

The case was originally presented to the court for decision on the merits by stipulated facts and exhibits submitted to the court in lieu of trial.

Plaintiff tribe invokes the jurisdiction of this court in matters involving Indian tribes and members thereof under Article I, Section 8 of the United States Constitution and under the provisions of 28 U.S.C. § 1362 which provides:

"The district court shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

The issue before the court is the determination of the right and power as between plaintiff tribe and the State of Michigan to provide for permanent custody of the three Wandahsega children.

## I. STIPULATED FACTS

Prior to his marriage in 1967, Leroy Wandahsega, now deceased, lived on the Hannahville reservation. He was a full-blooded Potowatomie Indian. In 1967 Leroy Wandahsega married Faye Wandahsega, a white person, and the couple lived on the reservation until they moved to Milwaukee in 1968. None of

their three children was born on the reservation. Leroy, Jr. was born in Escanaba, Michigan and Veronica and Tyrone were born in Milwaukee, Wisconsin. The children are Indians of the half-blood.

In 1970 the family returned to the reservation with their children and continued to live there together until Faye Wandahsega left the reservation with the three children sometime between October 1 and 9, 1971. In early 1971, Leroy Wandahsega worked for P & S Manufacturing Company in nearby Spalding, Michigan, until he was laid off that spring. Thereafter he worked in the woods. The family, while on the reservation, rented a home from the Public Housing Authority and rental thereof continued until the time of Leroy's death. Sometime prior to October 9, 1971, Faye Wandahsega and her children left Leroy and went first to Escanaba, Michigan. On October 9, the mother and three children left Escanaba to stay with the mother's aunt, Mrs. Helen Waldo in Bagley, Michigan where they stayed until October 19, 1971. At that time Mrs. Wandahsega rented a trailer home in Bagley and received direct relief benefits from the Menominee County Department of Social Services during that time. Earlier, when Leroy became unemployed in the spring of 1971, the family had also received public assistance. In the fall of 1971, the oldest child, Leroy, Jr., was enrolled in the Headstart Program on the reservation. On November 22, 1971, Faye Wandahsega left the three children with her niece, Mrs. Roseanne Baumler, at Stephenson, Michigan while she traveled to Menominee to request further assistance from the Department of Social Services in the form of additional funds, ostensibly to move herself and her three children to Milwaukee, Wisconsin. Upon returning to her trailer home on November 22, 1972, in the company of her mother, Leroy came into her home and apparently killed his wife and mother-in-law before killing himself. Other than this

last statement taken directly from the stipulation filed by the parties, there is no express determination of who actually survived the other as between the parents, beyond perhaps any inference to be drawn from the probable sequence of the shooting.

The three Wandahsega children, having thus been orphaned, continued to stay with Faye's niece, Mrs. Baumler. On November 29, 1971, Francis Grun, Juvenile Officer for the Menominee County, filed a petition with the Menominee Probate Court alleging that the three children were without legal custody and without guardianship and were, thus, dependent children within the meaning of the Michigan Juvenile Court. The petition requested the court to take "temporary custody of said children to facilitate proper planning for them."

On December 1, 1971 an order was issued by the Menominee County Probate Court making the children temporary wards of the court. On January 6, 1972, a further order was entered providing for the placement of the children in a licensed foster home under the Michigan Department of Social Services pending hearing on the petition filed November 29, which was subsequently held on January 13, 1972. A guardian ad litem, Steven G. Barstow, was appointed to represent the three children at the hearing. Also present were Mr. and Mrs. Jake McCulloch, paternal great uncle of the children, and their attorneys, Mrs. Alice Wandahsega, Mr. and Mrs. William Wilsey, the petitioning juvenile officer Francis Grun, and Gary Curtin, Regional Director of Youth Services with the Department of Social Services. Mr. and Mrs. Jake McCulloch had, on January 4, 1972, filed a petition for adoption of the children, Mr. McCulloch being their paternal great uncle. Mrs. Alice Wandahsega had, on December 1, 1971, filed a petition for guardianship of the children.

Following that hearing and by order dated January 13, 1972, the Menominee County Probate Court directed that the

three children be made permanent wards of the court and committed them to the Department of Social Services for admission to the Michigan Childrens Institute for purposes of adoption. The adoption planning and investigations were completed by the Department of Social Services and it was determined by the Department that the best interests of the children dictated that they be transported to Florida, there to be placed for adoption with Mr. and Mrs. William Wilsey, the children's maternal aunt and uncle.

Both sides concede that at the time of determination of these issues before the Menominee County Probate Court, it was found that both Mr. and Mrs. McCulloch and Mr. and Mrs. Wilsey were fit and suitable persons to have custody of the children.

On May 23, 1972, Jake McCulloch filed in Menominee County Circuit Court a petition for delayed appeal from the order of the Menominee County Probate Court which petition was denied on July 7, 1972. Thereafter, the Wandahsega children were taken to Florida by their prospective adoptive parents, Mr. and Mrs. Wilsey.

The stipulated facts do not indicate whether at any time the plaintiff Indian tribe appeared before or sought directly from either the Probate Court or the defendant herein the custody or physical possession of the Wandahsega children. On July 13, 1972, this action was filed and service had upon the defendant shortly thereafter.

All three of the Wandahsega children are listed on the membership rolls of the Hannahville Community which are kept in the Regional Office of the Bureau of Indian Affairs of the Department of the Interior.

Plaintiff tribe claims that it has a right under the foregoing facts to determine the custody of the Wandahsega children, and that this right is superior to any right of persons derived from the exercise of jurisdiction by the Probate Court for the County of Menominee. It is the plaintiff's contention that the exercise of jurisdiction of the probate court in determining permanent custody of said children is void, exclusive jurisdiction under federal law resting with the Potowatomie Tribe of the Hannahville Community.

As noted earlier, the legitimacy of the plaintiff as an established and recognized tribe having a defined tribal reservation within Menominee County is undisputed. As such a recognized tribe, plaintiff tribe operates pursuant to a written constitution and bylaws in addition to tribal custom. On May 29, 1936, by Order of the Secretary of the Interior, a constitution and bylaws were duly adopted pursuant to Section 16 of the Indian Reorganization Act of 1934, as amended. (See plaintiff's exhibit 2).

The Potowatomies established the constitution, according to its preamble, "In order to form a representative organization to promote the welfare of our people to preserve the land for ourselves and our children, and to provide homes for all the Indians of this community who need them . . .".

Article III of the constitution defines membership in the tribe. Section I of that Article provides that "All persons of Indian blood whose names appear on the census roll of April 1, 1934 of the Crandon Sub-Agency and who were at the time of that roll residing or entitled to reside on land bought in Michigan under the Act of June 30, 1913, and all their descendants who are so residing or entitled to reside at the time of the adoption of this Constitution are members of this Community. . . . "

Section 2 of the same article provides as follows:

"(a) Every child born to any member of the Community provided such member is a resident of the reservation at the time of birth of said child shall be a member of this Community.

"(b) Every child both of whose parents are members of the Community shall be a member of this Community.

"(c) Every child of one-half or more Indian blood born to any nonresident member of the Community shall be a member of this Community."

Under Article IV of the Potowatomie Constitution, the governing body of the Community is a council composed of the three officers of the Community and of nine councilmen, the three officers being the chairman, the secretary, and the assistant secretary who is also the treasurer.

Article V defines the powers of the council. Section 1 of that article provides in part that the council shall have the power

"to protect the health and well-being of the members of the Community and to develop the arts and crafts of the Community."

Section 4 of Article V provides as follows:

"Reserved powers.—Any rights and powers which the Wisconsin Potowatomies residing on government-purchased land in Michigan previously had but which are not expressly referred to in this Constitution may be exercised by the people of the Hannahville Indian Community through the adoption of appropriate by laws and constitutional amendments."

Following the adoption and approval of the Constitution of the tribe, it was duly incorporated as a federal corporation, the charter being granted by virtue of the 1934 Act (48 Stat. 984) to the Hannahville Indian Community of Michigan. It was duly ratified by the Community on August 21, 1937.

### Reopening of proofs

The case was stipulated to the court for decision upon the foregoing stipulated facts. Upon consideration, however, the court concluded that the stipulated facts were too bleak and skeletal to enable it to reach a full and fair adjudication. Accordingly, the court on its own motion, re-opened the proofs and called upon the parties to offer additional evidence at a hearing held on October 10, 1973. In an order dated September 26, 1973, the court requested proofs, to the extent available, on the following:

1. The existence or lack thereof of Potowatomie tribal customs as respects

   a) the status of children of the half-blood born to an Indian father and a white mother,

   b) care, custody and control of orphaned Indian children.

2. Attempts, if any, made by the Potowatomie Tribe or any representative of the tribe to have the children after the death of the parents and prior to the filing of this lawsuit.

3. What, if any, public or formal claim was made relating to the children's tribal status between the time of the parents' death and the filing of this lawsuit.

4. Any additional evidence relating to domicile, tribal custom, or tribal status of the children which is deemed relevant to the issues presented in this case.

The October 10 hearing produced the testimony of four witnesses, which is herein briefly summarized.

### James "Jake" McCulloch, Jr.

Jake McCulloch is an uncle of the deceased Leroy Wandahsega, and great-uncle to the three Wandahsega children. Presently, Mr. McCulloch is the President of the Council of the Hannahville Community.

He testified that except for six years, he had spent the entire thirty years of his life on the reservation. He is the brother of Alice, the children's paternal grandmother. Mr. McCulloch testified that he was close to the Wandahsega family, saw them regularly and had a good relationship with the children. He stated that Faye returned at least once to the reservation during the time between October 9 and the date of her death, although he did not know whether she stayed overnight on the reservation.

Mr. McCulloch said that he first heard the news about the three deaths at 11

o'clock on the night they took place, and then immediately went to his sister Alice and niece Sally's house. He had thought the children might be there. Upon discovering that they were not, McCulloch testified that the three decided to get an attorney as soon as possible to obtain custody of the children, which was done the following day. It was agreed that Jake should be guardian. Jake testified that, because of the ineffectiveness of Omar Sagatauk, the then-council president, who was later impeached, his attempts to call a meeting of the council regarding the children were unsuccessful.

Mr. McCulloch said that no attempts were made to contact Faye's family regarding the children because of the uneasy situation created by the murder-suicide.

McCulloch also testified that the children's toys and clothing remained in the father's house on the reservation before and after the death of the parents.

McCulloch testified that all children are enrolled as tribal members immediately upon their birth and that the Wandahsega children, as well as their mother Faye, as the wife of an Indian, were accorded all rights of reservation Indians, including free and complete medical treatment.

In May of 1972, McCulloch was elected acting chairman of the council. He denied that his election was primarily motivated by a personal desire to obtain tribe authorization for this suit.

Mr. McCulloch had a good relationship with Faye Wandahsega and testified that she was close to the other people on the reservation, and had a high regard for them, as they did for her.

Mr. McCulloch was unable to expressly point to any tribal customs regarding domestic relations. He indicated that reliance upon the state courts was a usual manner of obtaining relief in such situations.

Mr. McCulloch and his wife are currently licensed as foster parents by the Menominee Probate Court and by its order have three Indian foster children in their care on the reservation. The foster children are not themselves members of the Hannahville Community. The McCullochs are, themselves, childless.

*Sally Half-a-Day.*

Sally Half-a-Day, Leroy Wandahsega's older sister, a married woman with seven children, testified that she has been in the tribal council since May of 1972, and is currently the secretary. She testified that she called a June, 1972 meeting which was cancelled because the then-chief Sagatauk did not want to take time for a meeting.

Mrs. Half-a-Day was familiar with the Wandahsegas, seeing them almost daily. She testified that during Faye's absence from the reservation immediately prior to her death, the two women conversed frequently by telephone, and that Faye returned to the reservation several times during that period, and left the children in Sally's care on those occasions. She saw Faye at the Wandahsega house on the Wednesday before Faye's death.

Mrs. Half-a-Day stated that the day after the deaths, she made a number of phone calls in an attempt to locate the children. She also saw Mrs. O'Hara of the Department of Social Services, and said that Mrs. O'Hara informed her that it would be best if she didn't try to locate the children. Sally stated that Mrs. O'Hara did not want the children to be on the reservation. Sally stated that she called the State Police who referred her to Mrs. Bommer. Mrs. Bommer told Sally that the children were receiving good care, but would not tell her where they were.

Sally testified that she understood that Faye and Leroy had seen each other at the reservation on the Wednesday before the shooting, and that they had made plans to attend church together the following Sunday.

*Dr. James A. Clifton*

Dr. Clifton, a professor of anthropology at the University of Wisconsin at Green Bay, testified as an expert witness regarding Potowatomie history, culture and custom. He had worked among the Potowatomie Indians and had extensively studied Indian culture, and Potowatomie culture in particular. Dr. Clifton's expertise in this area was impressive.

It was Dr. Clifton's testimony that the Hannahville Community of the Potowatomies dates back to 1843, but there is little known history regarding the early years of the Community. Their constitution and by-laws were standard and were drawn up by the Bureau of Indian Affairs.

Dr. Clifton testified that in the social life of the Potowatomies, the traditional and contemporary problems of child care did not arise. The communities are fundamentally "kinship communities", wherein if a child lost both of his parents, other relatives automatically assumed responsibility for his care. The closest relatives were those traced on the father's side, i. e. patrilineal side. The father's line is very important, but the mother's is not ignored. Traditionally, a child would take a name selected from a set of names belonging to the father's side of the family. In Potowatomie culture, responsibility for the day-to-day care of the children was with the grandparents, even when the parents were living. The term "grandfather" also included great-uncles on the father's side. According to Dr. Clifton, under Potowatomie culture, Jake McCulloch would have been the customary grandfather since the grandfather himself was deceased.

In Potowatomie traditions, Dr. Clifton testified, adoptions are not referred to in the legal sense. In tribal custom, a person was "adopted" to replace a lost relative. Thus, the child was not adopted by an adult, but was considered to adopt a substitute parent. Formally, the child would pick a parent, and where

a minor was involved, the record would reflect the change. Potowatomies recognized the discretion of a child to make his own choice upon reaching a certain age. Dr. Clifton testified that the assumption of jurisdiction in forced adoption by white courts is a matter of great bitterness among the Indian community.

*Michael Miketinac, Regional Director of the Department of Social Services for the Upper Peninsula.*

Mr. Miketinac testified that his agency obtained custody of children only through the Probate Court, and that the Department conducts investigations when ordered to do so by that court.

He stated that Department studies the families, and files a racial and ethnic line if possible. He said that children on the reservation are treated no differently than those outside. There is apparently no recognition by the Department of any special status attaching to Indians living on reservations.

Mr. Miketinac stated that the Department considers a child of 25% or more Indian blood, to be an Indian.

He said that the Wandahsega children were committed to the Department by order of the Probate Court, and later procedures were undertaken for placement for adoption.

## OPINION AND CONCLUSIONS OF LAW

While it is generally held that Indian tribes and the members thereof are deemed wards of the United States and subject to its special protection, (see Groundhog v. Keeler, 442 F.2d 674, 678 [1971]), neither party to this lawsuit asserts that such special responsibility imposes upon this court in this case the duty of deciding which of two obviously different ways of life is preferable, or which of two potential guardians is the better fit to have personal custody of the children. Rather, the question presented to the court for determination is whether such decision is to be made by the Probate Court for the County of Menominee acting under Michigan law and

legal principles, or by the plaintiff tribe acting according to its tribal laws and customs.

■ Neither party has petitioned this court for appointment of a guardian ad litem on behalf of the children in this action, and upon inquiry by the court, each has asserted that such appointment is not required in view of the narrowness of the issue presented. Under the circumstances here, the court agrees and further finds that no potential advantage would inure to the benefit of the children by such appointment. To the extent the children are properly wards of the State of Michigan, any interest in such status is protected by the defendant and the Attorney General of Michigan appearing on his behalf. To the extent the children are not under this court's ruling properly such wards, the adversary role assumed by defendant and his counsel has adequately precluded any prejudice from failure to appoint a guardian ad litem.

■ While, therefore, the ultimate question of the best interests of the children is not directly before the court, it does not necessarily follow that the court is thereby precluded from any consideration of the question. Fundamental concepts of justice and humanity, as well as of wardship, impose upon the court the independent obligation to be satisfied that any order entered by it, however proper otherwise, does not result in actual harm or damage to the minor children involved here.

Likewise, nothing in the evidence remotely suggests the unfitness of Jake McCulloch and his wife. On the contrary, the past and present licensing of the couple for foster home care by the Menominee Probate Court affirmatively supports a finding of their present fitness.

Of course, no stigma can or should attach either to the tribe or to the paternal relatives of the children by reason of the tragic circumstances which brought about the death of the parents.

The court concludes on the facts here that no harm or danger to the children would arise by granting plaintiff tribe the relief sought, if it is otherwise entitled to it.

The court finds that the Wandahsega children were and are full members of the Hannahville Indian Community. They fall clearly within the definition thereof as set forth in the Constitution and Bylaws of the tribe. Membership in an Indian tribe has been variously defined in statute and in caselaw, depending in large part upon the circumstances under which the issue of membership arose. It is clear that in most cases and for most purposes the fact of mixed blood does not destroy the identity of such a person as Indian and, particularly, where the person is the child of an Indian of full blood.

Most cases and statutes which seek to define the term "Indian" define it within the context of a given situation, e. g. for purposes of receiving tribal property, (Waldron v. U. S., 143 F. 413 [8 Cir. 1905]), for the purposes of obtaining a census (see Felix Cohen: Federal Indian Law [1958] p. 6 n. 8) or for purposes of preclusion from the purchase of alcoholic beverages, (People v. Gebhard, 151 Mich. 192, 115 N.W. 54 [1908]), or for the purpose of construction of a particular statute (U. S. v. Rogers, 4 How. 567, 45 U.S. 567, 11 L.Ed. 1105 [1846]).[1]

The purpose asserted here is the purpose of exercise of tribal jurisdiction over orphaned minor children who are members of the tribe.

■ There are apparently two conflicting lines of authority regarding the status of offspring of Indian and non-Indian parents. One is the common law of which children of freemen take the status of the father. Defendant cites old cases which hold that children of a

---

1. For a discussion of the variables involved in defining the term, see *Cohen*, supra, Ch. 1.B "Definitions of 'Indian'" at pp. 4–12.

free father and a slave mother take the status of the mother. See U. S. v. Higgins, 103 F. 348 (9 Cir. 1900) and Alberty v. U. S., 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896). These cases do not appear at all controlling here, where both parents were, of course, free citizens. The second line of authority follows the "usual tribal custom" wherein children of a non-Indian father and an Indian mother take the status of the mother. See Waldron v. U. S., 143 F. 413 (8 Cir. 1905). Under the common law, these children would take the status of their father, and would, therefore, be Indian. Under the tribal custom doctrine, it would be logical to resort to the custom of the tribe involved, rather than to a more general tribal doctrine. No definitive evidence as to Potowatomie custom has been offered this court regarding the status of offspring of a white mother and an Indian father. However, the court, in keeping with the trend discussed above, of defining "Indian" in terms of specific purpose, concludes that the facts of the children's half-blood and their status as enrolled members of the tribe are sufficient to render them Indians for the purpose of this case—that is, determining the extent of tribal jurisdiction over them. Their enrollment is a key element in light of the importance of their relationship to the Potowatomie tribe and its reservation, in resolving the rights of the parties in this case.

## THE EXTENT OF INDIAN SOVEREIGNTY

The exact status of Indian tribes in their relationship with the United States and with the several states of the Union has a very long and often confusing history. See, generally, *Cohen*, supra.

Under 25 U.S.C. § 1322(a), the federal government has consented to the assumption of criminal and civil jurisdiction over reservations by the several states, provided, however, that such assumption is "with the consent of the tribe occupying the particular Indian country", 25 U.S.C. § 1322(a). The condition to the assumption of such jurisdiction has not been met by the State of Michigan with respect to plaintiff tribe in this case and thus no powers exist in the State of Michigan under such federal enabling legislation. See McClanahan v. State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) and Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L. Ed.2d 507 (1971).

The earliest Supreme Court case recognizing Indian Sovereignty was Worcester v. Georgia, 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483 (1832). In that case, Chief Justice Marshall, striking down a Georgia statute prohibiting residence of unlicensed white persons within the confines of the Cherokee nation, took the occasion to set down the historical legal relationsip between the several Indian nations and the colonies, and later the state and federal governments:

"The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed; and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term 'nation,' so generally applied to them, means 'a people distinct from others.' The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation,' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves,

having each a definite and well-understood meaning. We *have applied them to Indians, as we have applied them to the other nations of the earth; [*560 they are applied to all in the same sense." *Worcester,* supra, at p. 560.

Addressing itself specifically to the claimed force of Georgia law upon the Cherokee nation, the Court held:

"The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of Congress. The whole intercourse between the United States and this nation, is by our constitution and laws, vested in the government of the United States. The act of the state of Georgia, under which the plaintiff in error was prosecuted is, consequently void, and the judgment a nullity." *Worcester,* supra at p. 560

*Worcester* stands perhaps as the high-water mark of Indian Sovereignty in federal case-law. However, the basic concept of tribes as "separate dependent nations", so recognized in *Worcester,* although perhaps eroded to some extent, has remained a potent safeguard against repeated efforts to interfere with the historically unique relationship between Indian tribes and the United States, and with rights and prerogatives insured Indian tribes under the Constitution and laws of the United States.

The continuing viability of *Worcester* is demonstrated in Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) in which the Supreme Court held the State of Montana to be without jurisdiction to resolve a dispute between an Indian and a non-Indian arising out of a sale of goods on the reservation.

Speaking for a unanimous court, Mr. Justice Black observed:

"Despite bitter criticism and the defiance of Georgia which refused to obey the Court's mandate in *Worcester,* the broad principles of that decision came to be accepted as law. Over the years, this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of *Worcester* has remained." 358 U.S. at 219, 79 S.Ct. at 270.

Most recently, the Supreme Court, in McClanahan v. Arizona State Tax Commissioner, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), struck down an attempt by the State of Arizona to impose a personal income tax on reservation-derived income of an Indian. The court recognized the basic *Worcester* principle that "state law could have no role to play within the reservation boundaries", at 168, 93 S.Ct. at 1260, and further concluded that "cases applying the *Williams* test have dealt principally with situations involving non-Indians. . . . In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions". 411 U.S. at 179, 93 S.Ct. at 1266.[2] *McClanahan,* nevertheless, held that the state could reasonably assert no interest in affairs conducted by Indians alone on an Indian reservation.

It is the position of the defendant that whatever may be the rights of the plaintiff Indian tribe to govern the conduct and affairs of its members within its reservation, such rights do not extend beyond the geographical confines of the reservation and, particularly where the children involved are half white and are found as orphans outside of the res-

---

2. The standard applied in Williams v. Lee, supra, has come to be known, through later cases, as the "Williams test". Essentially, the test is whether the assertion of the state's interest in the occurrence infringes upon the tribal right to self-government. See *Williams,* supra, at p. 223, 79 S.Ct. 269.

ervation and within territorial jurisdiction of the state court.

■ It is true that as a general proposition, Indians who find themselves outside the reservation have generally the same rights and are subject to the same responsibilities and are subject to the jurisdiction of state courts in the same manner and to the same extent as other state citizens. Mescalero Apache Tribes v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). See also, *Cohen,* supra, at pp. 510–511 and cases cited. It is true also that under 8 U.S.C. § 1401, Indians are specifically declared to be citizens of the United States and that under the Fourteenth Amendment they are considered as well to be citizens of the state wherein the reservation is geographically located. Deere v. State of N. Y., 22 F.2d 851 (2 Cir. 1927).

■ It is also true that under M.S.A. § 27.3178(1) et seq., M.C.L.A. § 701.1 et seq., the probate court is authorized to take custody of neglected or abandoned children, or children otherwise without custody or guardianship, when "found within the county". It appears that these children where found, were covered by the literal language of the statute. The court assumes, therefore, that the initial exercise of jurisdiction for the *immediate* protection of the health and safety of the children was both proper and laudable.

The issue in this case, however, goes further.

Had the circumstances set forth in the above findings of fact all occurred within the boundaries of the reservation, there can be little doubt that no power or jurisdiction would exist in the probate court for the County of Menominee to take custody of or to determine questions involving the custody of the three Wandahsega children. Williams v. Lee, supra. See also State v. Superior Court, 57 Wash.2d 181, 356 P.2d 985 (1960) and In re Colwash, 57 Wash.2d 196, 356 P.2d 994 (1960), wherein the Supreme Court of Washington held that the state probate court was without jurisdiction

over the determination of custody of Indian children, enrolled as members of a tribe, and who resided on the reservation. *Colwash,* supra, so held, notwithstanding the fact that the Indian parents had abandoned the children. Nor would the probate court be in a position to question the procedures or customs by which, within the tribe, the physical custody of the children would be determined, at least in the absence of any compliance with the federal enabling statute. See *Cohen,* supra, at p. 117–118 re marriage and divorce customs, and cases cited. See also United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L. Ed. 1196 (1916), where the Supreme Court recognized:

> "At an early period it became the settled policy of Congress to permit the personal and domestic relations of the Indians with each other to be regulated . . . . according to their tribal customs and laws." at 603–604, 36 S.Ct. at 700.

■ If tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right, within its own boundaries and membership, to provide for the care and upbringing of its young, a *sine qua non* to the preservation of its identity. That sovereignty, as the Supreme Court has noted "predates that of our own government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. [But they are still] a separate people, with the power of regulating their internal and social relations." *McClanahan,* supra, at 172, 93 S.Ct. at 1263.

If then, Indians are to be accorded such independence and sovereignty within the limits of their reservation, and if on the other hand, they subject themselves to the benefits and obligations of state law when without, the question becomes at what point the transformation from one to the other is accomplished.

The court has been unable to find any existing case or statutory law which of-

fers precise guidance under the facts here. In other words, this appears to be a case of first impression.

■ Popular notions, both of the rights and customs of Indians as well as of their way of living have notoriously been inaccurate. See Introduction to Handbook of Federal Indian Law 1942 by Felix S. Cohen. Indeed, it is all too easy to assume either that in this latter period, the Indians' status is no different from that of other citizens of the United States, or to the contrary, that Indians and Indian tribes are somehow relegated to that romantic and historic role which fiction has preserved for them. It is apparent from this case, as it must be to anyone aware of Indians and Indian tribes in the 20th century that their way of life has, in fact, taken on many of the aspects of other citizens of the United States in habits, language and dress and that, as did the Wandahsega family, Indians frequently move in and out of reservations in pursuit of employment and for many of the same reasons which motivate other citizens. When they do, it is well established that their rights to mobility and to live outside the reservation temporarily or permanently cannot be impeded by the action of the tribe. See Standing Bear v. Crook, 25 Fed (as No. 14891 [1899]). Thus, had Leroy and Faye Wandahsega been legally domiciled in a community outside of the reservation at the time of their deaths, it is the opinion of the court that the tribe, if it was entitled to custody of the children at all, would have been obligated to submit itself to the jurisdiction of the probate court which had lawfully taken custody of the children, to have met the criteria for custody established by Michigan law, and to be governed by proper decision of the probate judge with respect to the best welfare of the children as provided

by law. See *Mescalaro*, supra. On the other hand, if Leroy and Faye Wandahsega had been living in their home on the reservation with their children and had, for example, been killed in an automobile accident, off the reservation, occurring while they were on a brief trip to visit friends or returning from a movie in a nearby town, could it then be said that this happenstance would be sufficient to divest the tribe of that right which was otherwise so inherently a part of its retained sovereignty? Or, if Leroy and Faye had themselves died within the reservation, leaving their children orphans and if the children had been abducted from the reservation and removed therefrom, could it be said that such an unlawful act could be interposed to deprive the tribe of such fundamental rights? It would seem to the court that while physical presence within or without the reservation may for most purposes be sufficient to dispose of the issues of jurisdiction, it is not sufficient to resolve the issues presented here. These issues go deeper and ought not to be controlled solely by either the situs of the parents' death or by the situs of the children's presence when they were taken into initial custody by the probate court.

■ On the contrary, it would appear to the court that the only rational approach is to determine the domicile of the children at the time their physical custody was gained by the probate court. Upon the facts contained in the stipulation in this case, as well as those obtained at the reopening of proofs, the court is of the opinion that at the time the physical possession was acquired by the probate court and subsequently through the probate court the Department of Social Services, the domicile of the children was within the reservation.[3]

3. The court is aware of a 1955 memorandum decision of the Department of the Interior, which ruled that an Indian tribe did not have jurisdiction to determine custody of an Indian child when she was found to be "neglected and dependent" in the City of Denver. See 62 I.D. 466 (1955). Although the opinion is not very clear, it appears that residence of the child was a factor and that the residence was off the reservation. In any event, this court is not bound by such

The general rule is that the domicile of minor children follows that of the parents and that where the parents are separated, the domicile is that of the parent with whom the child lives. Restatement of Conflicts § 313. It has also been held that the domicile of the wife follows that of her husband, although this rule is breaking down in a time that is increasingly recognizing the rights of married women. The general rule of domicile respecting adults, even notwithstanding special rules for married women, is that domicile requires two elements: intent and physical presence, which must concur in time. See In re Fox Estate, 3 Mich.App. 501, 142 N.W.2d 866 (1966). Further, it is generally held that an old domicile is not abandoned until a new one has been established. See Restatement of Conflicts, Section 15 (1934).

The facts upon which the court's decision must rest afford an ample basis for a finding by the court that, notwithstanding the fact that the children were found outside of the reservation, their domicile remained within. The following facts are particularly persuasive upon the court:

1. Leroy and Faye Wandahsega had, in fact, lived upon the reservation as husband and wife in a home there with their children since their return in 1971, a period of approximately 18 months.

2. The home continued to be rented and to be available to them and was occupied by the father up to the date of the death of the parents.

3. While it is apparently true that the couple was having severe domestic difficulties, there had in fact been no legal separation of husband and wife, nor was it known that there was any termination or any effort to terminate the existing marriage between them.

4. The children's toys and clothing remained at all times relevant to the case, at the reservation home of the deceased parents.

5. The children had returned to the reservation between the time they left in October and the parents' death.

6. The mother, Faye Wandahsega, had returned more than once between October 9 and November 22 and as late as the Wednesday before her death, had seen her husband Leroy and arranged to attend church with him.

To the extent that intent can be known, there is nothing other than the physical facts themselves to indicate that Faye did not, up to the time of her death, intend to return to the reservation ultimately, or that she intended permanently to abandon the home available to her there. The fact that she lived for a period of time with her mother and again with a friend and again in a rented house trailer, and the fact that she had applied for assistance to enable her to go to Milwaukee evidence an uncertainty as to her future which makes it impossible, under the facts here, to find that she had established any new domicile and abandoned the old.

Even if she had intended to abandon her former domicile (the reservation), she had not done so because she had not established a new one. See Restatement of Conflicts, § 15. Subsequent to Faye's departure from the reservation in October of 1971, there is no evidence that she was ever physically present in Milwaukee or any other place concurrent with an intent to make a home. Having failed to establish a new domicile, her domicile remained that of the reservation, and thus, so did that of her children. It is, therefore, the opinion of the court that, notwithstanding the physical absence of the mother and children from the reservation, that the domicile of both parents and thus of the children remained the reservation at Hannahville.[4]

---

administrative determinations, and is of the opinion that domicile is controlling.

4. In the circumstances, it is not necessary for the court to determine what weight, if any, ought to be accorded any inference from the probable sequence of events that the father may have survived the mother.

The court is of the opinion, therefore, that tribal custom ought to have governed the custody of the Wandahsega children, rather than the laws and procedures of the State of Michigan. Upon reopening proofs, the court was concerned with ascertaining the existence of a tradition or custom, and with discovering whether or not such customs had been abandoned, and indeed whether jurisdiction itself might have been waived or abandoned in favor of the probate court. Upon consideration of all the proofs and applicable caselaw, the court concludes that tribal custom existed, was followed in spirit and largely in practice until frustrated by the actions of employees of the Michigan Department of Social Services, and that the tribe has neither conferred jurisdiction upon the Michigan Probate Court, nor waived its right to assert its jurisdiction before the federal court. While the evidence showed that it was quite usual for the community to rely upon state agencies and state courts in matters involving marriage, divorce, law enforcement and guardianship of children, the evidence failed to show that the precise problem facing the Hannahville Community in this situation had arisen before. The court does not find that past reliance on state government for aid in Indian problems constituted a waiver of jurisdiction in this case. See *Cohen,* supra, 402 (1958).

The court finds that the Hannahville Indian Community is comprised of Wisconsin Potowatomies and that the history and customs of the Wisconsin Potowatomies are applicable to members of the Hannahville Community. The court finds, as testified to by Dr. Clifton, that the Potowatomies are patrilineal, that it was in accordance with an unwritten, unarticulated, but nonetheless living custom, for Jake McCulloch to take control and custody of the children. He attempted to do this in all avenues available to him. Although he acted according to a *custom,* the court finds, and he so testified, that he was acting upon his own family interest in the welfare of the children, when he sought their custody through the probate court. That court had already taken possession of the children under the circumstances. To petition the state court to voluntarily grant him custody of the children was rational, given his interest in the children. In so doing, he submitted himself to the personal jurisdiction of the court as to that case. But the actions of an individual person, even if in accord with custom, cannot create subject matter jurisdiction over Indian affairs in a state court. The tribe itself must have, by some prior act performed through a legally recognized procedure, conferred jurisdiction upon the court. Note that in Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), it was held that a vote by a tribal council was insufficient to create jurisdiction over Indian affairs, where the statute (25 U.S.C. § 1326) required a majority vote of the adult Indians of the tribe, voting at a special election.

Indeed, had no one from the tribe made any attempts to locate and care for the Wandahsega children between the time they became orphaned and the time this lawsuit was filed, this court might be inclined to find, not a conferring of jurisdiction upon the state court, but perhaps a waiver of the right to assert tribal jurisdiction.

But such is not the case. Efforts were made by the parties to whom tribal custom would dictate custody to find and care for the Wandahsega children. The fact that the attempts were made by an individual seeking to assert his personal interest in the children does not mean that the tribe had failed to assert its jurisdiction. Indeed, the tradition of the Potowatomies reveals that it is their custom to act informally, through blood relatives, in affairs of the family. Had Jake McCulloch been successful in finding the children, returning them to the reservation, and commenced caring for them, it well may be that the tribal authorities may have con-

sidered that no dispute existed over which to assert jurisdiction and render a decision. Whereas, in white society, orphaned children may always present a question for procedural government intervention, that may not be the case among Indian tribes. It is not for this court or the state court to say that the Hannahville Community must have a formal procedure to determine guardianship. It is sufficient that the tribe has shown that, according to its standards, it did not abandon interest in the children or jurisdiction over them. Relinquishment of Indian rights is not to be lightly inferred. Doubts as to the intent of a law, or a treaty, are to be resolved in favor of the Indians, and are to be construed as the Indians understood their meaning. See Waldron v. U. S., 143 F. 413 (8 Cir. 1905). If this be so, doubts as to existence of a custom or the intent to abandon a custom must likewise be resolved in favor of the Indians.

The proper test, under the principle of *Waldron* is to consider whether the members of the tribe understood the actions of a tribal member to gain custody and control of a member of his family according to custom, to constitute a waiver of its rights to assert tribal jurisdiction. The court finds that the Indians did not so understand, that they did not at that point conceive that they were acting according to concepts of principal and agent, but were rather living their custom—to have the paternal great uncle seek to care for his parentless nephews and niece.

Thus, the court concludes that the Hannahville Community neither waived objections to jurisdiction by permitting Jake McCulloch to seek personal custody of the Wandahsega children, nor by failing to appear before that court to contest its jurisdiction, since by permitting his appearance to gain personal custody, he was acting in a practical manner to fulfill a tribal tradition.

## CONCLUSION

This court finds that the Wandahsega children are and were at all times re-ferred to herein members of an Indian tribe, and at all times relevant to this decision were domiciled on the reservation. The court further finds that the tribe has a tradition—although not a procedure—for care and custody of orphaned children members, and that this tradition was followed to the extent possible with respect to the Wandahsega children after the death of their parents. The court finds that the care and custody of Indian children is a matter of Indian concern and interest, and is, therefore, an internal Indian affair within the meaning expressed in numerous federal decisions, See *Worcester,* supra; *Williams,* supra; *Kennerly,* supra and *McClanahan,* supra; and that jurisdiction over its own affairs in this regard was neither conferred by the tribe upon the state probate court, nor was it waived by the actions of Jake McCulloch, or any inaction by the tribe.

The determination of permanent custody of the children, therefore, as a question involving the affairs of reservation Indians residing on the reservation, remained, under settled principles of law, within the exclusive jurisdiction of the tribe. *Worcester,* supra; *McCLANAHAN,* supra. This being the case, the court is of the opinion that the probate court, while perhaps within its jurisdiction to care for the immediate needs of the children, was without jurisdiction to take permanent custody of them, and is without jurisdiction to enter further orders for the adoption or other custody of the Wandahsega children.

## RELIEF

Questions of the form of any judgment and relief provided for in it were, by agreement, left to the further consideration of the court and counsel, following decision on the merits.

As indicated in the Opinion, Jake McCulloch occupies a dual role in the case, as president or chief, and as grandfather and natural custodian under tribal custom. While withholding any final decision until counsel can be heard, the

court suggests that relief which would designate McCulloch as that person to receive the children on behalf of the tribe might be appropriate.

Accordingly, it is ordered:

1. That a hearing on relief be held at the courthouse in Grand Rapids on December 7, 1973 at 3:00 p. m.

2. That not less than 10 days prior thereto, counsel for plaintiff shall file with the court and deliver a copy thereof to counsel for defendant, a proposed form of final judgment and brief in support thereof.

3. That not less than three (3) days prior to said hearing, counsel for defendant shall file any brief in opposition thereto and any alternate form of judgment he may desire the court to consider.

4. That the parties may, by written stipulation, waive hearing and submit the case on the documents to be filed.

5. That any party deeming an evidentiary hearing necessary shall immediately notify the court and opposing party, and in no event later than ten (10) days before hearing, together with the identity of any witnesses and expected length of testimony.